IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREG COOPER, JR.,          )   No. C 06-4872 MJJ (PR)
                              )
          Petitioner,   )  **ORDER DENYING PETITION FOR**
                              )  **WRIT OF HABEAS CORPUS**
   v.                     )
                              )
A.J. MAYFI,            )
                              )
          Respondent.  )
_____ )

Petitioner, a California prisoner proceeding pro se, filed the above-entitled petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the petition should not be granted based on petitioner's two cognizable claims for relief. Respondent has filed an answer and memorandum in support thereof. Petitioner did not file a traverse.

## PROCEDURAL BACKGROUND

In 2002, petitioner was convicted by a jury in Humboldt County Superior Court for the murder of Tina Wells Cooper[1], and with being a felon in possession of a firearm. Petitioner was sentenced to a total prison term of 127 years to life. On appeal, the

---

[1]For clarity because petitioner and the victim shared the same last name, this opinion will refer to the victim as "Tina."

California Court of Appeal affirmed the conviction, and the California Supreme Court denied the petition for review.

## FACTUAL BACKGROUND

The following facts are taken from the opinion of the California Court of Appeal:

Appellant's wife, Tina Wells Cooper, was shot and killed at the Crown Pub in Eureka shortly after midnight on April 21, 2001. According to Tina's relatives and friends, the marriage was not happy. At the time of the murder, Tina lived in Eureka and appellant lived in Richmond.

Tiffany Taylor, a lifelong friend of Tina's, testified that she had a telephone conversation with appellant about three weeks before the murder in which appellant said he was mad at Tina and stated, "I'm going to kill that bitch if she don't come back." Tiffany testified that appellant had previously used the name Tony Moore as an alias. About three weeks before Tina's death, Tiffany saw Tina at the hospital, where appellant had taken her because she had slit her wrists.

On April 5, 2001, Tina filed for divorce and applied for a temporary restraining order against appellant. In her affidavit in support of the application, Tina stated that appellant had mentally and physically abused her on February 20, and on April 3, had threatened to kill her and her son.

Sarah Simmons was a friend of Tina's but had had a "falling out" with her. About three weeks before Tina's murder, Simmons was "intimate" with appellant. The day before the murder, Simmons told appellant in a telephone conversation that Tina was having an affair with a man named Jack Rawson. Appellant hung up on Simmons. After midnight on April 21, appellant called Simmons and told her Tina was dead.

Shayne Taylor (Tiffany's husband) testified that at about 1:00 p.m. on April 20, appellant called Cassidy Hess's house and asked Shayne where Tina was. Shayne testified that appellant said "Tina gonna make him flash or something. He was saying that she playing with him."

Appellant's cellular telephone records reflect that a call was made from his cell phone at about 3:36 p.m. on April 20, in Richmond. Calls were made later in the afternoon from San Rafael and Novato and, at 5:45 p.m., from Cloverdale. Subsequent "roaming" calls were made in the Mendocino and Eureka regions, but the records did not reflect the precise location from which these calls were made.

At 10:29 p.m. on April 20, appellant called June Skillman, Tina's material aunt, and told her to ask Tina's mother to stop calling people saying he was in Eureka. Appellant called again at 3:10 a.m. and Skillman told him Tina had been shot; appellant laughed and said she "must have made somebody very mad." In March 2001, appellant had come to Skillman's house and she had seen a nine millimeter Glock pistol in the back of his pants.

Tina went to the Crown Pub around midnight on April 21, with Cassidy Hess, Amber Brannon and Shayne Taylor. Shayne testified that

while he was sitting next to Tina at the bar, someone came in and said they had seen "Greg" drive by. Shayne went outside to spit out his cognac, of which he had taken too big a swallow. Shayne met appellant, whom he identified in court, three or four feet from the door. Appellant told Shayne to bring Tina outside and Shayne heard him tell a woman at the door to tell Tina to come outside because her cousin Tony wanted to talk to her. Tina peeked out the door, appellant saw her, "barged through the door," put his coat over his head and started shooting. Shayne had previously seen appellant about four times, most recently about a year before the shooting.

Pauline Clark was outside the Crown Pub smoking a cigarette a few minutes before midnight on the night of the shooting. A black man approached, asked if she knew Tina, and asked her to tell Tina that "her cousin was outside and he needed money to get into the party." The man said his name was "Tony." As Clark was about to go back inside, the man "bombarded his way in front of me without paying" and chased Tina to the end of the bar, and Clark heard gunshots. Clark identified appellant in a police photographic lineup at the beginning of May. She told the police she had heard the shooter was married to Tina and Tina was trying to divorce him.

Hess and Brannon testified that shortly after they arrived at the Pub, Tina said she saw her husband in his car outside. According to Hess, Tina became scared and nervous and started walking toward the bouncers, with Hess following. Hess saw appellant push past the bouncers; Tina turned and ran toward the pool tables and appellant started shooting her. Brannon testified that she heard noise from the crowd toward the door and saw appellant, with a jacket or hood pulled over his head and a gun at his side, "sliding through the crowd." Tina looked at appellant and started running; appellant followed and started shooting her.

Hess testified that she knew who appellant was when he entered the bar and shot Tina; she got a clear look at the shooter's face and recognized it as appellant's. She had seen appellant briefly on two occasions some three to five years before. She identified appellant in a police photographic lineup the day after the shooting.

Brannon testified that she got a good, clear look at the shooter's face. She had previously seen photographs of appellant and Tina together and recognized appellant from those photographs; she had never met appellant in person. She identified appellant in two photographic lineups and recognized him as the shooter at the preliminary hearing. The detective who showed Brannon the photographic lineup testified that although Brannon had never met appellant, when she looked at the lineup she said, "That's Greg."

Yvonne Webb, who had known Tina since she was a young girl, testified that Tina came to her in the Crown Pub, looking frightened, and said her husband was outside. They started to walk toward the front door but Tina backed up before they got there, as though she was scared. A man entered the Pub, moving past Webb "close enough to kiss," and she got a clear look at his face. She did not recognize him. Webb turned to ask Tina if this was her husband but Tina was already moving to run, looking frightened. As the man chased Tina, Webb recognized who he was and she and the bouncer chased after him. He rapidly shot Tina in the back and head. Webb identified appellant as the person who shot Tina. She had previously seen pictures of appellant but had not met him in person. Police Officer Dunn testified that he did not ask Webb to do a photographic lineup. Webb told Dunn that she did not recognize the shooter and wondered who he was as he moved past her.

Tyrone Griffin, who had known Tina since they were children, was at

the Crown Pub when Tina was shot. Tina ran in, screaming "help!" Someone was chasing her, Griffin saw "fire from a gun" and Tina fell. The assailant ran up and fired shots from a semiautomatic pistol into the back of her head, then "threw" the hood of his sweatshirt or jacket back on his head and ran out of the bar. Griffin identified appellant at trial as the man who shot Tina. He testified that appellant was right next to him when he fired the first shot and Griffin got a clear look at his face. Griffin had met appellant five or six years before the trial. Since then, he had seen appellant "around, like on the street" and when appellant came by to visit Griffin's brother.

Griffin's wife, Jennifer Johnson, also identified appellant as the shooter. Johnson had never met appellant. She was a foot and a half to two feet from Tina, sitting at the corner of the bar, when Tina was shot; she was about two and a half feet from appellant and could see his face clearly. Johnson testified that appellant "ran up behind" Tina and shot her once, then stood over her and shot her four to six more times. When shown a photographic lineup by the police, Johnson had chosen a photograph and was almost but not 100 percent sure.

David Scott Rogan was in the Crown Pub around 12:45 or 1:00 a.m. on April 21 when he heard a woman scream, felt himself pushed toward the bar and heard gunshots to his left. He looked and saw "a man with a gun up a lady's head." Rogan did not know the victim. He was about five feet away from the shooter and got a clear look at the man, whom he identified in court as appellant. He identified appellant from a police photographic lineup.

Rogan's girlfriend, Jennifer Bayless, testified that Tina, whom she knew as an acquaintance, ran through the bar and pushed by her. Bayless heard gunshots and saw a black man shooting a semiautomatic pistol. Bayless was a few feet away from the man, across the corner of the bar. The man "grabbed" Tina and "shot down into her." Bayless was not able to positively identify the shooter in a photographic lineup but found one photograph that was "similar." In court, she testified that appellant looked "similar" to the shooter: His eyes, face and skin color were the same, but the shooter's hair was not as full and he did not have "a lot of facial hair." Bayless could not be positive that appellant was the shooter. She acknowledged that at the preliminary hearing she had said she did not have a clear recollection of the shooter's face, she "just kn[e]w that he's a black male," and she only saw the shooter from the back.

Lori Liston was standing in the doorway of the Crown Pub when someone pushed past her. She saw a black man open his coat and reach for something black, a girl in the bar start running and the man chase her, then heard six gunshots. Liston identified appellant at trial as the man she saw, stating that she got a clear look at his face as he pushed past her. She had picked his picture from two photographic lineups a few days after the shooting.

Dave Hill, the manager at the Crown Pub, was tending bar on April 21, when a person ran in front of him and ducked down by the bar, about three feet from where Hill was standing. Another person came running behind the first, with a jacket pulled over his head, and started firing a gun. The victim fell and the shooter ran; Hill chased him and caught him at the door. The shooter pointed the gun at Hill, then turned and pointed the gun at people who had run up behind him in the parking lot, then ran across the street. Hill chased him for about three blocks. Hill testified that he got a clear look at the man's face, which was about two and a half feet from Hill's when the man pointed his gun at him, and identified him as appellant. Hill testified that his identification of appellant was based on what he saw the night of the

shooting, stating that after what happened to him, appellant's face "will stick in my mind for a long time...."

After the shooting, patrons of the bar gathered in the parking lot. Many of the witnesses testified that the crowd was kept there by the police. A few, however, testified that they were not prevented from leaving and did so within a few minutes of the shooting.

Webb was interviewed by a police officer inside the bar, after Tina was taken out, and told the officer that Tina's husband, Greg Cooper, shot her. Griffin told an officer in the parking lot that he had seen Gregory Cooper shoot Tina.

The witnesses' descriptions of the assailant were consistent in some respects and differed in others. All agreed the shooter was wearing a dark jacket or sweatshirt. Several witnesses remembered him wearing dark pants or jeans; others did not remember his pants. Two witnesses testified the shooter was wearing white tennis shoes; other witnesses did not remember his shoes. Most of the witnesses testified that the shooter had no facial hair. Clark testified that he had a mustache and small beard, although she acknowledged having told the police at the time of the shooting that the shooter had no facial hair. Clark also testified that the man was wearing a white tee shirt and a baseball cap. Shayne Taylor testified that appellant was "bald-headed" and pulled his coat over his head when he entered the bar. Brannon and Rogan also testified that appellant had a jacket or hood pulled over his head. Two witnesses, Webb and Bayless, testified that they saw a second person with a gun at the Crown Pub.

Most of the witnesses had seen appellant's name and photograph in the newspaper, on television or on posters around town after the shooting. Webb also had "glanced" at photographs of appellant at Tina's mother's house since the shooting. Most of the witnesses had discussed the incident with other people or heard general talk about it. When Hess was asked whether she had told people since the incident that appellant shot Tina, she replied, "Everybody knows." Johnson testified that she had neither seen the photographs of appellant nor discussed the incident with anyone except her husband (Griffin); and Bayless testified she had not discussed the incident with others, including her boyfriend (Rogan). Police Officer Jeffrey Daniel acknowledged that a lineup would be unreliable if the witnesses had previously seen the suspect's photograph and identification in the newspaper or on television.

Many of the witnesses had some alcohol before the shooting, but none felt they had had enough to affect their perception and recall of the events. Brannon had a beer earlier in the evening but was not intoxicated at the time of the shooting. Shayne had "half a drink" of cognac and no other intoxicants. Griffin had a couple of beers before the shooting but was not feeling intoxicated. Johnson had a beer earlier in the evening and was drinking a second at the time of the shooting. Rogan had shared a pitcher of beer with his brother earlier in the evening and had one drink at the pub, but did not feel his ability to perceive and recall was impaired. Hill had one or two sips of a drink. Hess had consumed no alcohol before the shooting; she did not drink.

At the time of trial, Hess was on felony probation for "grand theft of a personal." Griffin acknowledged being on felony probation for burglary and having had legal problems "around domestic violence." Clark was in custody at the time of trial on a theft matter and acknowledged having prior theft convictions. About a week before Tina's death, Shayne Taylor had been kicked out of a drug program he had been required to attend by the probation department. Shayne knew that Tina was a cocaine dealer.

Eureka Police Officer Tim Jones responded to the scene of the shooting. Tyrone Griffin told Jones he was standing about two feet away from Tina when the incident began and saw the shooter, whom he identified as Gregory Cooper. Griffin said he had known Cooper for four or five years. Jones located a blue 1998 Ford Expedition, license plate 4RFS480, in the parking lot of the Canton Café at 1010 Broadway and impounded it. This parking lot connected to another lot between the Café and the Pub.

Jason Sanders had known Tina and her mother for some eight to 10 years and had never seen appellant before the trial. At the time of the shooting, he was in the parking lot of the Crown Pub and saw a black man in dark clothing touching the hood of Tina's car. The man had a short afro and "kind of funny looking" or "bugged out" eyes. The man joined the line waiting to enter the Pub. Sanders looked away and within 15 seconds heard a series of gunshots. After the shooting, Sanders pointed the police to a black Ford "Excursion" parked in the lot. Sanders had seen this vehicle several hours earlier at Tina's mother's house.

Eureka Police Officer Jeffrey Daniel was the lead investigating detective on this case. When he arrived at the murder scene about 12:52 a.m. on April 21, he found yellow caution tape strung from the Pub beyond the Canton Café, with about 85 to 100 people in the parking lot area, talking to each other, "restless" and "boisterous." The victim had been removed from the scene and appellant had been identified as a suspect before Daniel arrived at the scene. Jones directed Daniel to the blue green Expedition, which was parked backed into a stall, and Daniel noticed a telephone adaptor plugged into the accessory outlet. The registered owners of the vehicle were appellant and Raquel Williams, and the car was subsequently released to Williams.

After the preliminary hearing, a fight arose between spectators at the hearing. Daniel gave his investigation file on the case to Cassidy Hess, whom he knew to be a witness in the case, in order to free his hands to intervene in the fight. She had his file about 20 minutes.

Appellant's cell phone records for April 21 showed a call at 10:29 a.m. in Geyserville, then calls from successively southerly locations in Healdsburg, Santa Rosa and, at 11:48 a.m., Richmond.

Shortly before 7:00 p.m. on April 21, Detective Daniel received a phone call at his office from appellant. The call was taped and played for the jury. Appellant said he was at home in Richmond. When Daniel told appellant he had been identified as a suspect in Tina's shooting, appellant said they had him mixed up with someone else. Appellant said he was not in Eureka and his girlfriend and cousin had used his Ford truck. He agreed to have his girlfriend call Daniel. Daniel told appellant he was going to be arrested and advised him to turn himself in to the local police department. Appellant ended the call. The next day, Daniel was at Mary Skillman's house and had her listen to the voicemail greeting on the cellular phone number he had been given as appellant's. She hung up and appellant called her; Daniel spoke with him and appellant said he was nearby.

Katie Koopman testified that she had known appellant for about five years and had dated him in June and July 2000. When she first met him, he went by the name "Tony Moore." On the day of Tina's funeral in early May, appellant called Koopman and asked her to take pictures of the funeral for him. Appellant asked, "If I dressed up like a girl, do you think anybody would recognize me?" Appellant said during the conversation that he did not kill Tina.

Appellant was arrested on September 5, 2001, at an apartment

complex in Clear Lake Oaks. Sergeant Patrick McMahon of the Lake County Sheriff's Department testified that when he and other officers entered the apartment, appellant identified himself as "Larry." Deputy Sheriff James Samples, who was positioned outside the apartment, saw appellant attempt to climb out a rear window when officers entered the front door. Samples shouted at appellant, who went back into the apartment. Lakeport Police Officer Norman Taylor searched the residence and found a California driver's license with a photograph of appellant and the name "Larry DeVoux" in the bedroom. Other indicia in the name of "Larry DeVoux" was also found in the apartment.

Raquel Williams, appellant's girlfriend, testified that she had been to Eureka once before the trial, when she drove there with Michael Reese, in the Expedition she and appellant owned, to pick up marijuana. When they arrived at 10:00 or 11:00 p.m., she dropped Reese at the Flamingo Motel and went out to have a drink. She saw a lot of people "hanging out" at the Crown Pub and parked the vehicle, nose in, in a stall next to a restaurant across the street. As she walked across the parking lot, she heard gunfire. She ran across the street to the gas station to call Reese from a pay phone, then went to get the car but found the police had roped off the area. In the morning, she called the police, trying to locate her car, but no one knew where it was or how to find it. A friend from the Bay Area drove up and gave her a ride back. When she returned to Richmond in the early afternoon, everyone was saying that Tina had been killed the night before. After numerous phone calls over the next month, she finally got the car back and sold it.

Williams testified that when she spoke with Detective Daniel in April 2001, she was not honest, telling him Reese had driven the car to Eureka and denying appellant was her boyfriend. She wanted to get her vehicle back and to avoid further involvement in the case. She first told the true story to a defense investigator with whom she spoke in October 2002.

Michael Reese, appellant's cousin, confirmed Williams's description of the events. He testified that Williams was hysterical when she came back to the motel room and that they learned of Tina's death "through the streets" when they returned to Richmond.

Christin Kukar testified that appellant and his girlfriend, Altha Sims, were at her house in Clear Lake Oaks on the evening of Friday, April 20, 2001; Sims was Kukar's boyfriend's sister. Kukar remembered the date of the visit because her friend's birthday was April 19. The friend, Lacey Proctor, was 20 years old. Kukar acknowledged on cross-examination that it could have been Saturday, April 21, rather than Friday, April 20, when appellant came to her house. She also acknowledged that she knew of appellant's arrest in September 2001, but did not tell anyone about appellant being at her house on April 20 until she was contacted by the defense investigator in September 2002.

Forensic psychologist Robert Shomer testified as an expert in the areas of memory, perception and eyewitness observation. He testified that a person's memory combines direct perceptions, input from other people and assumptions; people are unable to fully distinguish one of these sources from another, especially in dangerous, stressful situations. Observations made in unexpected, highly stressful situations are less accurate, because the observer is more focused on self protection than on making careful observations. Shomer testified that a person's confidence in the accuracy of his or her eyewitness perception is not related to its actual accuracy. With the passage of time, people become more confident in their memory of an event while in fact

the accuracy of the memory decreases; once a person comes to believe he or she saw an event in a particular way, the person becomes invested in that scenario and believes it even more strongly, especially where there is a personal connection to the victim. Where a weapon is involved, people focus more on the weapon than on the person wielding it. Seeing a photograph of a person assumed to be associated with the event can influence the witness's subsequent identification in a lineup.

Shomer was given the hypothetical situation of a person shot and killed in a crowded bar, late at night, with the patrons then kept in the parking lot together. He testified that observations in such a situation were "notoriously unreliable and ... full of vividness without a lot of accuracy," as witnesses reacting to the shock would not make detailed observations of the assailant's features but rather would form general impressions to which they would then commit themselves. Everyone would want to know what had happened, and remarks by anyone in the group could influence others. Portrayal of an individual's photograph in the media and on handbills in the area would further "corrupt" the process of identification and prior knowledge by witnesses of marital discord between the victim and her husband would strongly dispose the witnesses to believe the husband was the assailant. Shomer testified that with all these factors at play, a conclusion based on assumption rather than actual perception at the time of the shooting would be "irresistible." The situation would be "fertile" ground for "hysterical contagion," in which people's impressions of what actually happened are influenced by others' impressions, "homogeniz[ing]" into a "third version" of the facts.

The district attorney's investigator testified that he searched Department of Motor Vehicles records for a 20-year-old female named Lacy Proctor. He found two individuals meeting this description, one of whom lived in Clear Lake Oaks. Her birth date was April 13, 1982.

Detective Daniel testified that when he spoke with appellant on April 21 and 22, appellant did not mention Kukar or Clear Lake Oaks

People v. Cooper, No. A102048, Slip Op. at 2-12 (Cal. Ct. App. May 13, 2005)

(hereinafter "Slip Op.") (attached as Resp.'s Ex. E) (footnotes omitted).

## DISCUSSION

A.    **Standard of Review**

Petitioner's habeas corpus petition is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), whereby a district court may grant relief on the basis

of a claim that was reviewed on the merits in state court only if the state court's

adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

1   2254(d).

2       Under the 'contrary to' clause of 28 U.S.C. § 2254(d)(1), a federal court may grant a

3   writ if the state court's conclusion is "opposite to that reached by this Court on a question

4   of law or if the state court decides a case differently than this Court has on a set of

5   materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 413 (2000).

6   An 'unreasonable application' occurs when the state court identifies "the correct governing

7   legal principle" from the appropriate Supreme Court decision but "unreasonably applies

8   that principle to the facts of the prisoner's case." Id. at 412-13. The federal court on habeas

9   review may not issue the writ "simply because that court concludes in its independent

10  judgment that the relevant state-court decision applied clearly established federal law

11  erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively

12  unreasonable" to support granting the writ. Id. at 409.

13      In any event, habeas relief is warranted only if the constitutional error at issue is

14  structural error or had a "'substantial and injurious effect or influence in determining the

15  jury's verdict.'" Penry v. Johnson, 532 U.S. 782, 795-6 (2001) (quoting Brecht v.

16  Abrahamson, 507 U.S. 619, 638 (1993)). When highest state court to rule on petitioner's

17  claims provides no reasoned opinion, the court looks to the last court to issue a reasoned

18  opinion, which in this instance is the Court of Appeal. Ylst v. Nunnemaker, 501 U.S. 797,

19  801-6 (1991).

20  **B.    Petitioner's Claims**

21      The instant federal habeas corpus petition presents two cognizable claims. First,

22  petitioner claims the prosecution violated his Sixth Amendment right to counsel and to

23  attorney-client privilege when material was seized from his jail cell prior to trial, which

24  allegedly resulted in the prosecution obtaining his trial strategy. Petitioner also claims the

25  trial court erred in requiring him to prove he was prejudiced by the violation. Secondly,

26  petitioner claims the trial court violated his rights under the Confrontation Clause by the

27  trial court's admission of Tina's declaration in support of her application for a temporary

28

1    restraining order.

2        **1.    <u>Interference with Attorney-Client Relationship</u>**

3        Petitioner claims his Sixth Amendment right to counsel was violated when the trial

4    court denied petitioner's motions to dismiss and to exclude the testimony of sheriff's

5    deputy, Jeffrey Daniel, based on Daniel's seizure of privileged documents from petitioner's

6    jail cell prior to trial.

7        The Court of Appeal described the facts underlying petitioner's first claim as

8    follows:

9            On January 17, 2002, a search warrant was served on appellant and the
        written material in his jail cell was seized. The following day, appellant filed
10        a motion for return of the material, which appellant stated included privileged
        attorney-client communications, attorney work product and other privileged
11        and confidential material. Appellant requested an immediate hearing, an order
        directing return to the court of all the seized material, unread, and all copies
12        made of the material, and an in camera hearing for review of the documents.
            At a hearing on January 18, the prosecutor did not object to the
13        requested orders for return of property and setting of an in camera hearing.
        The court ordered return of the property and set an in camera hearing for
14        January 22, at which the court reviewed the seized items with appellant and
        his counsel. On May 15, the court filed its order finding that certain of the
15        items (court exh. Nos. J2, J4, J5-6, J6 and J7) were protected by attorney-
        client privilege and the attorney work product rule. The court ordered that
16        copies of these documents be provided to the defense and the originals
        remain under seal in the court's file. The remaining documents to which
17        appellant's motion was directed (court exh. Nos. J1 and J3) were ordered
        returned to the police department and/or prosecutor's office.
18            On June 20, appellant filed a motion to dismiss on the grounds that
        law enforcement improperly obtained confidential attorney-client
19        communications in violation of his constitutional rights to counsel, to due
        process and against self incrimination under the United States and California
20        constitutions. Appellant stated that the papers seized from his cell contained
        his remarks and thoughts about his defense strategy and that he was now
21        afraid to make any notations on documents to assist his attorney, did not trust
        the confidentiality of his correspondence with his attorney, and was afraid to
22        communicate with his attorney about the facts of the case or defense strategy.
            The prosecutor filed a declaration stating that he had not seen the
23        material seized from appellant's cell; that he discussed the search with the
        detective who conducted it and was assured it was conducted "in a fashion
24        which respected attorney-client privilege," and that the prosecution had
        "gained absolutely nothing as a consequence of the search of which the
25        defendant complains."
            The judge who had conducted the in camera review recused himself
26        and after a hearing on July 8, the new judge denied appellant's motion. The
        court found that the search warrant was executed as part of an investigation of
27        threats appellant allegedly made to potential prosecution witnesses; that the
        court had examined the seized documents and those that came within

28

attorney-client privilege and ordered certain of them sealed; and that the prosecutor had indicated by declaration that he had not seen these documents. The court concluded that appellant had not demonstrated the prejudice requisite to justify dismissal of the charges and therefore denied the motion to dismiss.

Prior to trial, appellant moved to exclude the testimony of Detective Daniel, arguing this was the only meaningful remedy for the violation of the attorney-client relationship because the knowledge gained from the material continued to "reside" in Daniel's brain. The prosecutor asked the court to review the materials to assess what Daniel might know that could justify the remedy sought by the defense. Defense counsel stated the court could not do this because the documents had been sealed. The court acknowledged that the situation presented the defense with a "Catch-22" because it could not demonstrate prejudice without revealing the documents to the prosecution. The court noted that appellant had already been afforded the remedy of in camera review and sealing of the privileged documents and held that exclusion of Daniel's testimony was not warranted "[a]t least at this point without any further showing of substantial prejudice or substantial threat of prejudice."

(Slip Op. at 13-14.)

The Sixth Amendment provides that "[i]n criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense," U.S. Const. amend. VI, and such right can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding. Weatherford v. Bursey, 429 U.S. 545, 553 n.4 (1997). However, "[i]mproper interference by the government with the confidential relationship between a criminal defendant and his counsel violates the Sixth Amendment only if such interference substantially prejudices the defendant. Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." United States v. Danielson, 325 F.3d 1054, 1069-70 (9th Cir. 2003) (quotations and citation omitted).

The Ninth Circuit described in Danielson the necessary showing of prejudice and the burden of proof in a case in which the interference has resulted in the prosecution

learning a defendant's trial strategy. First, the defendant must make a prima facie showing of prejudice. Id. at 1071. It is not enough that the government informant was involuntarily present and passively received privileged information. Id. Rather, "the government informant must have acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information." Id. at 1073-74 (defendant satisfied his burden under first step by showing that the government deliberately sent informant to obtain information from defendant, that the informant affirmatively inquired to obtain privileged trial strategy information from defendant, the privileged information was told to and memorialized by members of the prosecution team, and the lead prosecutor kept much or all of this information in his private office).

Second, once the prima facie case has been established, the burden shifts to the government to show that there has been no prejudice to the defendant as a result of these communications. Id. at 1074. The mere assertion by the government of the integrity and good faith of the prosecuting authorities is not enough to meet the burden. Id. at 1072. Rather, the government must present evidence and show by a preponderance of that evidence that all of the evidence it proposes to use and all of its pre-trial and trial strategies were derived from legitimate independent sources. Id. at 1071, 1074. Absent such a showing by the government, the defendant has suffered the prejudice necessary for a Sixth Amendment violation. Id. at 1073 (prosecutor did not go far enough in efforts to insulate himself and members of his prosecution team from privileged trial strategy where informant continued to elicit and report information about trial strategy and prosecutor did not repeat his earlier instruction to the informant to stop making such inquiries).

The California Court of Appeal affirmed the trial court's denial of petitioner's motions to dismiss and to exclude Daniel's testimony. The Court of Appeal determined petitioner had suffered no prejudice based on the following reasoning:

> Appellant argues, based on *U.S. v. Danielson* (9th Cir.2003) 325 F.3d 1054 (*Danielson*), that the trial court erred in imposing upon him the burden to demonstrate prejudice from the seizure of materials. In *Danielson*, the police and prosecution encouraged a paid informant to report on and record

conversations with the defendant, including privileged information about trial strategy. *Danielson* held that because the government's interference with the defendant's attorney-client relationship was "neither accidental nor unavoidable, but was rather the result of deliberate and affirmative acts ..., if there was prejudice there was a violation of the Sixth Amendment under *Weatherford v. Bursey*, [*supra*,] 429 U.S. 545." (*Danielson*, at p. 1059.)

*Danielson* noted that the problem was greater than if the government had deliberately elicited incriminating statements from an indicted defendant in the absence of counsel, in which case the statements would be excluded from the prosecution's case in chief: "The problem in this case ... is not that the government obtained incriminating statements or other specific evidence, but rather that it obtained information about Danielson's trial strategy." (*Danielson*, *supra*, 325 F.3d at p. 1067.) Where the prosecution has impermissibly obtained "a particular piece" of incriminating evidence, the defendant bears the burden of demonstrating prejudice. (*Id.* at p. 1070.) *Danielson* explained, however, that "where wrongful intrusion results in the prosecution obtaining the defendant's trial strategy, the question of prejudice is more subtle. In such cases, it will often be unclear whether, and how, the prosecution's improperly obtained information about the defendant's trail strategy may have been used, and whether there was prejudice. More important, in such cases the government and the defendant will have unequal access to knowledge. The prosecution team knows what it did and why. The defendant can only guess." (*Ibid.*)

*Danielson* adopted a two-step test for prejudice developed in *Kastigar v. United States* (1972) 406 U.S. 441, in the context of Fifth Amendment violations. "First, the defendant must make a 'prima facie showing of prejudice,' "including that the government "acted affirmatively to intrude into the attorney-client relationship." (*Danielson*, *supra*, 325 F.3d at p. 1071.) If that showing is made, the burden shifts to the government to prove the defendant has not been prejudiced. In this regard, "the mere assertion by the government of 'the integrity and good faith of the prosecuting authorities' is not enough. [Citation.] Rather, the government must present evidence, and must show by a preponderance of that evidence, that 'all of the evidence it proposes to use,' and all of its trial strategy, were 'derived from legitimate independent sources.' [Citation.]" (*Danielson*, at p. 1072, quoting *Kastigar v. United States*, supra, 406 U.S. at p. 460.)...

Although the trial court did not follow this procedure here, we find no prejudice. The documents seized from appellant's cell were sealed and copies returned to the defense; the prosecution had very limited, if any, access to them and the defense was not deprived of them. None of the material was directly presented at trial. Appellant's claim of prejudice is that access to the privileged material might have given the prosecution an advantage by allowing Daniel to shade his testimony in light of his knowledge of appellant's defense strategy. Daniel's testimony, however, did not address matters which could have been affected by appellant's trial strategy. Daniel's testimony covered his investigation of appellant's vehicle, his presentation of photographic lineups to witnesses, and the telephone call he received from appellant. Appellant's defense at trial, that his vehicle was in Eureka because Williams and Reese had driven it there, was identical to the explanation he gave Daniel in the recorded telephone conversation on April 21, 2001. The only aspect of appellant's defense not addressed in the telephone conversation with Daniel was Kukar's testimony that she remembered appellant being at her house on April 20, by reference to the date of a friend's birthday. The prosecution apparently did not have advance notice of this alibi witness, as it

worked "overnight" after her testimony to find evidence that the friend's birthday was in fact on a different date.

Perhaps more importantly, the evidence against appellant was overwhelming. Multiple eyewitnesses to the shooting identified appellant as the perpetrator. Appellant stresses on appeal various factors that might undermine the reliability of these identifications: That most of the witnesses had not met appellant or had last seen him years before the incident; that witnesses in the bar might have consumed more alcohol than they admitted; that witnesses knew each other, discussed the events and influenced each others' memories of what occurred; that witnesses' perceptions were influenced by their post-event exposure to media treating appellant as the suspect; and that Tina's friends and family were predisposed to believe appellant was the murderer. These factors, however, were presented at trial and strenuously argued by the defense, but apparently rejected by the jury.

Appellant's alibi defense was undermined by the facts that Kukar was not certain whether appellant was at her house on Friday, April 20, or Saturday, April 21; that the friend's birthday by which Kukar claimed to know which weekend appellant was at her house was in fact a week earlier; and that Kukar did not come forward with the alibi until she was contacted by the defense a month before trial. Appellant's explanation that his vehicle was in Eureka on the night of the murder, parked by the Crown Pub, because Williams had driven it there was weakened by her testimony that she parked the car "nose in" when in fact it was found backed into the stall, and by her acknowledgment that she initially lied to the police when questioned about the events. Contrary to appellant's assertion that he was not in Eureka at the time of the murder, appellant's cellular telephone records indicated he traveled to Eureka on April 20, 2001, and returned to Richmond the next day. Appellant had moved to a different county and was using a different name when he was arrested in September 2001.

(Slip Op. at 19-22.) The Court of Appeal concluded "there [was] virtually no possibility a different verdict would have been reached even if Daniel's testimony had been excluded." (Id. at 22.)

As an initial matter, petitioner argues that the trial court improperly placed the burden on him to prove prejudice from the seizure of his materials rather than requiring the prosecution to prove that it did not gain an advantage from the seizure. However, as explained in Danielson, in order to shift the burden to the government to prove they did not use privileged information the defendant must first establish a prima facie showing of prejudice, and such burden is not satisfied merely because the government informant was involuntarily present at a meeting and passively received privileged information about trial strategy. Danielson, 325 F.3d at 1071. Rather, "the government informant must

have acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information." Id. at 1073-74.

Petitioner, here, has not pointed to any evidence that law enforcement "deliberately" or "affirmatively" intruded into the attorney-client relationship for the purpose of obtaining the defense trial strategy. Detective Daniel served a valid search warrant on petitioner for the sole purpose of an investigation of threats to potential witnesses, not to interfere with petitioner's relationship with his defense counsel. (Slip Op. at 13-14.) Daniel was not looking for evidence or trial strategy regarding the pending murder charge on the behalf of the prosecution. (Id.) In addition, the prosecutor filed a declaration stating that he had not seen the material seized from petitioner's cell, and that Daniel, the detective who conducted the search, assured the prosecutor that the search was conducted "in a fashion which respected attorney-client privilege." (Id. at 14.) Therefore, under the governing federal law set forth in Danielson, the state courts properly found that the petitioner had the burden to show prejudice, and that such burden did not shift to the prosecution.

Secondly, petitioner contends the record contains sufficient evidence of prejudice that the trial court's failure to either dismiss or exclude Daniel's testimony violated petitioner's Sixth Amendment rights. The California Court of Appeal's rejection of this claim was not "contrary to" federal law within the meaning of AEDPA because, as described above, it applied the correct federal standard from Danielson and it did not decide this case differently from the Supreme Court on a set of materially indistinguishable facts. See Williams v. Taylor, 529 U.S. 362, 413 (2000).

The California Court of Appeal's decision, was furthermore a "reasonable application" of federal law within the meaning of AEDPA. The trial court's unrebutted factual findings, which this Court must presume are correct, 28 U.S.C. § 2254(e)(1), establish that the prosecutor had not seen the material seized from petitioner's cell, and that the prosecution had gained absolutely nothing as a consequence of the search of

which the defendant complains. Petitioner argues Daniel could have formulated in

advance answers to anticipated questions and shaded his testimony to meet expected

defenses because Daniel had advance notice of petitioner's defense strategy. Petitioner,

however, did not want the court to engage in an in camera review of the documents,

which had been previously been sealed, to determine what kind of information Daniel

was privy to prior to trial. (Slip Op. at 14.) Nonetheless, Daniel's testimony did not

address matters which could have been affected by knowledge of petitioner's trial

strategy, and only covered Daniel's investigation of appellant's vehicle, his presentation

of photographic lineups to witnesses, and the telephone call he received from petitioner.

(Id. at 21.) Additionally, petitioner had already told Daniel of the alibi petitioner related

at trial – that his girlfriend and cousin were driving his truck on the day of the murder –

when he spoke to Daniel on the phone on April 21, 2001. (Id.) As the Court of the

Appeal pointed out, had the prosecution gained improper information about petitioner's

alibi defense during the search of the cell, the prosecution would have been better

prepared to meet the testimony of petitioner's witness, Christin Kukar, when she took the

stand. (Id.) Under these circumstances, the California Court of Appeal could reasonably

conclude that the seized materials did not sufficiently prejudice petitioner so as to violate

his Sixth Amendment rights. See Weatherford v. Bursey, 429 U.S. at 556-58 (holding

without a presence of tainted evidence, communication of defense strategy to the

prosecution, and a purposeful intrusion by the agent, there was no violation of the Sixth

Amendment).

Moreover, habeas relief could only be granted if the admission of Daniel's

testimony resulted in actual prejudice, i.e. if such admission had a substantial and

injurious effect upon the verdict. See Brecht v. Abrhamson, 507 U.S. 619, 637 (1993).

Here, the evidence against petitioner was so overwhelming that any error in failing to

exclude Daniel's testimony was harmless. Numerous witnesses positively identified

petitioner as the shooter, his cell phone records demonstrate that he was headed toward

1  Eureka on the afternoon of the murder, and his truck was left at the scene of the shooting.

2  (Id. at 2-9.)  Petitioner's explanation that his vehicle was in Eureka on the night of the

3  murder, parked by the Crown Pub, because Williams had driven it there was weakened by

4  her testimony that she parked the car "nose in" when in fact it was found backed into the

5  stall, and by her acknowledgment that she initially lied to the police when questioned

6  about the events.  (Id. at 10-11.)  Petitioner also moved to a different county under a

7  different name, and attempted to climb out of a rear window when officers came to arrest

8  him.  (Id. at 10.)

9  In light of the foregoing, the California Court of Appeal's finding that petitioner

10  had not been prejudiced by the document seizure from his jail cell was not an

11  unreasonable application of, or contrary to Supreme Court precedent.  Moreover, the

12  evidence against petitioner was such that any error in failing to exclude Daniel's

13  testimony was harmless.  Accordingly, habeas relief is not warranted on this claim.

### 2. Confrontation Clause

Petitioner's second claim is that the trial court violated his rights under the

Confrontation Clause by admitting Tina's declaration in support of her application for a

temporary restraining order against petitioner.

The California Court of Appeal made the following factual findings underlying

this claim:

> The application was filed on April 5, 2001. Tina's declaration stated
> that on February 20, appellant "came together to talk," but "[h]e instead made
> the situation unhealthy by physical and mental abuse." She further stated that
> on April 3, 2001, appellant threatened to kill her, her son, and any other
> person around her. She stated that she was so convinced he would follow
> through on the threats that she cut her own wrist to scare him, and that she did
> not feel she or her child were safe.
> At an Evidence Code section 402 hearing, Skillman (Tina's maternal
> aunt) testified that Tina told her she had filed for divorce and applied for a
> restraining order because appellant kept threatening to kill her. On March 4,
> the day before Tina's birthday, Tina came to Skillman's house, crying, after
> visiting appellant. Tina said her marriage was over and insisted she had to
> "get out of here" before appellant came. On April 1, Skillman asked Tina in a
> phone conversation whether she was going to come over and Tina said she
> was not, because appellant was mad at her and "[h]e kn[e]w where all my
> family stay."

1    Tiffany Taylor testified that Tina told her about an argument during which appellant held a gun to Tina's eye. Tiffany then got a call from appellant asking how to get to the hospital because Tina had "cut herself." Tiffany received a note from Tina at the end of March or beginning of April in which Tina indicated she expected that appellant would kill her or she would kill herself. Debra Bryant (Tina's mother) testified that appellant and Tina "always argued" and appellant "always threatened, threatened to kill her, me and the family."

Tina's grandmother, Mary Kennerson, testified that the night Tina was killed she came to Kennerson's house and told Kennerson to get police protection. Tina said appellant had threatened to kill her and she was afraid. Tina had told Kennerson three or four weeks earlier that she was afraid of appellant.

The trial court found the requirements of Evidence Code section 1370, subdivision (a)(1), (a)(2), (a)(3) and (a)(5) were met: The declaration described "the infliction or threat of physical injury upon the declarant," the declarant was deceased, and the statement was made "at or near the time of the infliction or threat of physical injury." With respect to subdivision (a)(4), the court stated that the fact the declaration was made under penalty of perjury and filed with the court "in and of itself, might indicate trustworthiness." The court acknowledged that the declaration was made "in contemplation of pending or anticipated litigation in which the declarant was interested" (§ 1370, subd. (b)(1)), but stated, "That's only one factor as to its trustworthiness." The court found the declaration was corroborated by the testimony at the section 402 hearing (§ 1370, subd. (b)(3)) and that the only motive for requesting the restraining order was protection. The court noted that there were no minor children, so nothing was to be gained in terms of a custody battle by making a false allegation, and that there were no assets or debts subject to disposition by the court in the dissolution proceeding.

After appellant's opening brief on this appeal was filed, the United States Supreme Court overruled *Ohio v. Roberts* in *Crawford v. Washington* (2004) 541 U.S. 36 [124 U.S. 1354](Crawford ). *Crawford* held that a testimonial statement by a declarant not present at trial could be admitted only if the declarant was unavailable and the defendant had had a prior opportunity to cross-examine the declarant. (*Crawford*, at 68-69.) "Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (*Ibid.*) The Court held that "testimonial" statements include, at a minimum, "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations." (*Id.* at p. 68.)

Respondent concedes that Tina's declaration, made under penalty of perjury in order to initiate a judicial proceeding, was testimonial.

(Slip Op. at 22-23.)

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The federal confrontation right applies to the states through the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  Crawford v. Washington, 541 U.S. 36, 61 (2004).  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.  Id.; see Davis v. Alaska, 415 U.S. 308, 315-16 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-examination).  The Clause thus reflects a judgment, not only about the desirability of reliable evidence, but about how reliability can best be determined.  Crawford, 541 U.S. at 61; see, e.g., United States v. Medjuck, 156 F.3d 916, 919 n.1 (9th Cir. 1998) (Confrontation Clause serves purposes of  ensuring that witnesses will testify under oath, forcing witnesses to undergo cross-examination, and permitting the jury to observe the demeanor of witnesses.); Wood v. Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992) (the right to confrontation includes the right to cross examine adverse witnesses and to present relevant evidence).[2]

The Confrontation Clause applies to all "testimonial" statements.  See Crawford, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  Id. at 51 (citations and quotation marks omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").

Not all testimonial statements are inadmissible at trial.  The Crawford court explained, "the rule of forfeiture by wrong (which we accept) extinguished confrontation claims on essentially equitable grounds . . . . See Reynolds v. United States, 98 U.S. 145, 158-59 (1879)."  541 U.S. at 62; see also Davis v. Washington, 126 S.Ct. 2266, 2280 (2006).  In Reynolds v. United States, the Supreme Court explained: "The Constitution

_____

[2]Cross-examination includes the right to show the witness's possible bias or self interest in testifying.  See Chipman v. Mercer, 628 F.2d 528, 530 (9th Cir. 1980); Skinner v. Cardwell, 564 F.2d 1381, 1388-89 (9th Cir. 1977), cert. denied, 435 U.S. 1009 (1978).

gives the accused the right to a trial at which he should be confronted with the witnesses

against him; but if a witness is absent by his own wrongful procurement, he cannot

complain if competent evidence is admitted to supply the place of that which he has kept

away. The Constitution does not guarantee an accused person against the legitimate

consequences of his own wrongful acts. It grants him the privilege of being confronted

with the witnesses against him; but if he voluntarily keeps the witnesses away, he cannot

insist on his privilege. If, therefore, when absent by his procurement, their evidence is

supplied in some lawful way, he is in no condition to assert that his constitutional rights

have been violated." 98 U.S. at 158.

Confrontation Clause claims are also subject to harmless error analysis. <u>United</u>

<u>States v. Nielsen</u>, 371 F.3d 574, 581 (9th Cir. 2004) (post-<u>Crawford</u> case. For purposes

of federal habeas corpus review, the standard applicable to violations of the Confrontation

Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the

jury. <u>See</u> <u>Hernandez v. Small</u>, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing <u>Brecht v.</u>

<u>Abrahamson</u>, 507 U.S. at 637).

The California Court of Appeal found any Confrontation Clause violation to be

harmless. The Court of Appeal determined as follows:

> Even assuming the doctrine of forfeiture by wrongdoing did not apply
> here and Tina's declaration was inadmissible under *Crawford*, error in
> admitting it would be subject to harmless error analysis. (*See Arizona v.
> Fulminante* (1991) 499 U.S. 279, 307 [confrontation clause violation among
> errors subject to harmless error analysis] (citation omitted). We find any error
> in this case harmless beyond a reasonable doubt. (*Chapman v. California*
> (1967) 386 U.S. 18, 24.)
>     The evidence against appellant was overwhelming. As described
> above, multiple eye-witnesses positively identified appellant as Tina's
> murderer. Two witnesses testified that Tina told them she saw appellant
> outside the Crown Pub just before the shooting. Appellant's car was found in
> the parking lot by the bar and his cell phone records demonstrated he was
> driving toward Eureka on April 20, and returned to Richmond on April 21.
> Several witnesses testified that appellant and Tina's marriage was unhappy;
> Tiffany Taylor testified that she heard appellant say in a telephone
> conversation about three weeks before Tina was killed that he was going to
> kill her if she did not come back, and Simmons testified that she told
> appellant on the afternoon before Tina was murdered that Tina was involved
> with another man. On these facts, it is clear beyond a reasonable doubt that
> appellant would have been convicted of this offense even if Tina's declaration

1    had not been admitted into evidence.

2    (Slip Op. at 27-28.)

3         Where, as here, the state court disposed of petitioner's Confrontation Clause claim

4    as harmless under Chapman v. California, 386 U.S. 18, 24 (1967), a federal court must,

5    for purposes of applying the "unreasonable application" clause of § 2254(d)(1), determine

6    whether the state court's harmless error analysis was objectively unreasonable.  See

7    Medina v. Hornung, 386 F.3d 872, 878 (9th Cir. 2004).  If the federal court determines

8    that the state court's harmless error analysis was objectively unreasonable, and thus an

9    unreasonable application of clearly established federal law, the federal court then

10   proceeds to the Brecht analysis.  Id. at 877.  Accordingly, this Court now turns to the

11   issue of whether the Court of Appeal's harmless error analysis was objectively

12   reasonable.

13        Petitioner argues the admission of the declaration was highly inflammatory

14   because such evidence was featured prominently in the prosecution's case to the jury.

15   (RT 199, 1518-21, 1622-23.)  Tina's declaration was admitted immediately following

16   opening arguments and was the first piece of evidence received by the jury.  (RT 199.)

17   The prosecutor began his closing argument by reading the text of the declaration to the

18   jury, and gave the following interpretation of the declaration: "Please, courthouse people,

19   help me. Please issue a restraining order that requires him to stay away from me . . .

20   Please do that immediately. He's got a nine millimeter. Issue a restraining order. Take his

21   guns. I don't feel safe. He's threatened to kill me. And I think he will."  (RT 1518-19.)

22   The prosecutor went on to explain how the declaration showed that petitioner had the

23   motive to kill Tina.  (RT 1520-21.)  The prosecutor closed by reminding the jury that Tina

24   had come to the court seeking help, worried that her husband would kill her, and said, "it

25   turns out she was right."  (RT 1622.)   During deliberations, the jury asked to see Tina's

26   declaration.  (RT 1640-41.)  The judge instructed the jury they already had a copy of all

27   the restraining order materials as People's Exhibit 19.  (Id.)  Therefore, petitioner

28

1  contends Tina's declaration was so potent that its admission was not harmless beyond a

2  reasonable doubt under Chapman.

3        Petitioner fails to note the jury simultaneously requested other parts of the record,

4  such as the transcript of the Cooper/Daniel phone interview when they asked to see Tina's

5  declaration. (Id.)  Moreover, Tina's declaration was duplicative of substantial other

6  evidence showing that petitioner had threatened to kill her.  Several eye-witnesses

7  testified that petitioner and Tina's marriage was unhappy.  (Slip Op. at 2.)  Tiffany Taylor

8  testified that she heard petitioner say in a telephone conversation about three weeks

9  before Tina was killed that he was going to kill Tina if she did not come back.  (Id.)

10  Sarah Simmons, Tina's former friend and an "intimate" friend of petitioner shortly before

11  Tina's death, testified that she told petitioner on the afternoon before Tina was murdered

12  that Tina was involved with another man, and that petitioner immediately hung up the

13  phone after Simmons relayed this information.  (Id.)

14        In addition, the other evidence in the case against the petitioner was so

15  overwhelming that there was virtually no possibility a different verdict would have been

16  reached even if Daniel's testimony had been excluded.  As described previously, multiple

17  eye-witnesses positively identified petitioner as Tina's murderer.  (Slip Op. at 3-7.)  Two

18  witnesses testified that Tina told them she saw petitioner outside the Crown Pub just

19  before the shooting.  (Id. at 3-4.)   Another witness, Pauline Clarke, testified that a black

20  man approached her outside the Pub, asked her if she knew Tina, and asked her to tell

21  Tina that "her cousin was outside and he needed money to get into the party."  (Id. at 4.)

22  She testified that the man said his name was Tony.  (Id.)  Tiffany Taylor testified that

23  petitioner had previously used the name "Tony Moore" as an alias.  (Id. at 2.)  Petitioner's

24  car was found in the parking lot by the bar and his cell phone records demonstrated he

25  was driving toward Eureka on April 20, and returned to Richmond on April 21.  (Id. at 9.)

26  Petitioner's alibi defense was also undermined by the fact that Christin Kukar was not

27  certain whether petitioner was at her house on Friday, April 20, or Saturday, April 21;

28

that the friend's birthday by which Kukar claimed to know which weekend petitioner was at her house was in fact a week earlier; and that Kukar did not come forward with the alibi until she was contacted by the defense a month before trial. (Id. at 11-12.)  On April 20, at 10:20 p.m., shortly before Tina's murder, petitioner called June Skillman, Tina's material aunt, and told her to ask Tina's mother to stop calling people saying he was in Eureka. (Id. at 3.)  Petitioner called again at 3:10 a.m. and Skillman told him Tina had been shot; petitioner laughed and said she "must have made somebody very mad." (Id.)  Lastly, petitioner moved to a different county under a different name, and attempted to escape when he was arrested in September 2001.  (Id. at 10.)

In light of this overwhelming evidence of petitioner's guilt, it is clear beyond a reasonable doubt that appellant would have been convicted of this offense even if Tina's declaration had not been admitted into evidence.  Consequently, the California Court of Appeal's harmless error analysis was objectively reasonable under the Chapman standard. Accordingly, petitioner is not entitled to habeas relief on this claim.

### CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file and terminate any pending motions.

IT IS SO ORDERED.

DATED:      3/3/2008

_____
MARTIN J. JENKINS
United States District Judge